## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JAMES R. LEACH,

      Plaintiff,

v.                                Case No: 8:19-cv-330-CEH-CPT

KURT A. HOFFMAN,[1] ANTHONY
ALLPORT, KYLE POINSETT, LORI
BETH CLARK, KARLA SMALL,
KYLE COLLISON and MATT
TUGGLE,

      Defendants.

_____/

## **O R D E R**

      This cause comes before the Court upon the Defendants' Motion for Summary Judgment (Doc. 82). Plaintiff James R. Leach responds in opposition (Doc. 97).

      Proceeding *pro se*, James R. Leach lodges numerous claims under 42 U.S.C. § 1983 and Florida law against the Sarasota County Sheriff and certain deputy sheriffs. The Sheriff and the deputy sheriffs now move for summary judgment on all claims. For the reasons set forth below, the Court will grant Defendants' Motion for Summary Judgment.

---

[1] When Leach filed the operative complaint, Thomas Knight served as the Sarasota County Sheriff. Leach sues Knight in his official and individual capacities. Doc. 50 ¶8. However, the Court takes judicial notice of the fact that Kurt A. Hoffman became the Sarasota County Sheriff on January 5, 2021. *See* Fed. R. Evid. 201(b). As discussed below, although Leach sues Knight in his official and individual capacities, the Court construes all claims against Knight as official-capacity claims. Thus, Hoffman is automatically substituted for Knight on all official-capacity claims against Knight. *See* Fed. R. Civ. P. 25(d).

## I.   BACKGROUND

### A. Statement of Facts[2]

The events giving rise to this action occurred at 360 Center Road in Venice, Florida, on February 7, 2017. Doc. 101 at 2. At that time, James R. Leach resided with his mother at that location. *Id.* Leach's mother called the police to report a domestic disturbance. Doc. 83 at 4:5–10, 5:19–25, 6:1.[3] Sarasota County Deputy Sheriff Lori Beth Clark responded to the call and was the first officer to arrive on scene. *Id.* at 4:11–13. Leach's mother was at the scene; Leach was not. *Id.* at 6:2–7; Doc. 95 at 1.[4]

---

[2] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including: the Amended Statement of Joint Stipulated Facts (Doc. 101); the testimony of Anthony Allport (Doc. 93-1), Lori Beth Clark (Doc. 83), Karla Small (Doc. 84), Luke Sniegowski (Doc. 89-6), and Matt Tuggle (Doc. 95); and the affidavit of James R. Leach (Docs. 89-1, 95). Further, where a party fails to properly support an assertion of fact or properly address another party's assertion of fact, the court may consider that fact undisputed. Fed. R. Civ. P. 56(e)(2).

[3] For ease of reference, all deposition pinpoint citations refer to the deposition page number, not the CM/ECF page number.

[4] Leach failed to move for summary judgment by the Case Management and Scheduling Order's dispositive motion deadline. Instead, on the deadline to respond to Defendants' summary judgment motion, Leach filed a combined motion for summary judgment and response to Defendants' Motion for Summary Judgment (Doc. 89). Leach submitted evidence in support of that filing. The Court denied the combined motion and response, without prejudice, stating that Leach had failed to move for summary judgment by the CMSO's deadline. Doc. 91. The Court directed Leach to file an amended response within fourteen days and advised that if he desired an extension of the dispositive motion deadline so that he could move for summary judgment, he needed to file a motion. *Id.* Leach neither requested an extension of the dispositive motion deadline nor moved for summary judgment. Instead, he filed an amended response to the Motion for Summary Judgment, which is the operative response (Doc. 97). In this response, Leach references the evidence that he provided in support of his combined motion and response. Also, Leach filed a "supplement" the day before filing his amended response, which contains additional evidence (Doc. 95). Here, Leach did not procedurally default in filing his amended responses. *See Mosley v. MeriStar Mgmt. Co, LLC*, 137 F. App'x 248, 250 (11th Cir. 2005) (explaining that procedural default is

Sarasota County Deputy Sheriff Anthony Allport joined Clark at the scene. Doc. 83 at 5:12–18; Doc. 84 at 6:16–18; Doc. 93-1 at 5:21–25, 6:1. For the domestic disturbance, Clark determined that no crime had occurred; a fear of future violence was not present because the other party was not present at the scene. Doc. 83 at 7:14–18, 8:5–9, 51:18–21.

As explained herein, Leach does not dispute that Clark returned to her patrol vehicle after speaking with his mother and "ran everyone's information in [the] computer" and researched the involved parties because she intended to write a report. *Id.* at 7:14–23, 8:2–22, 34:15–20. Leach also does not dispute that during Clark's research into the two parties involved in the domestic disturbance call, a DAVID search displayed the registered owner of a white van, who was the other party involved in the domestic dispute, along with a photograph of the owner. *Id.* at 11:22–25, 14:16–24. Clark also conducted a driver's license check on Leach. *Id.* at 34:15–25, 35:23–25, 36:1–2. Clark learned from the search that Leach's license was suspended and that he had three prior convictions for driving while his license was suspended. *Id.* at 34:8–25, 35:5–13, 37:21–25, 38:1–4, 56:21–25; Doc. 93-1 at 18:22–25, 19:1–10, 32:17–21. Clark

---

not excused simply because a party is proceeding *pro se*). Instead, he timely filed his amended response and that response references earlier evidence. As such, the Court will consider Leach's submitted evidence. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (stating that district courts "must consider all evidence in the record when reviewing a motion for summary judgment—pleadings, depositions, interrogatories, affidavits, etc.—and can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists").

believed that "three [prior DWLS] convictions was a felony [DWLS], and therefore was arrestable." Doc. 83 at 32:12–22.

The parties also do not dispute that, at some point after Clark's arrival, Leach drove by the residence in his van. Doc. 83 at 10:9–12; Doc. 95 at 1. Beyond that, Clark and Allport testified that Clark observed Leach and that the deputies followed him. Clark and Allport testified to the following facts. Clark claims that she observed a white van driving west on Center Road while conducting the driver's license check on Leach outside the home, Doc. 83 at 10:9–13, 13:2–3, whereas Allport testified that he and Clark had already departed from the residence and were "maybe a half mile away from the residence" when they "ma[de] contact" with Leach, Doc. 93-1 at 9:1–25, 10:1. Clark identified the van's driver, who was the other party involved in the reported disturbance, as Leach. Doc. 83 at 11:22–25, 14:16–24, 56:21–25; Doc. 93-1 at 11:16–23. Leach's mother had informed Clark that Leach was wearing a red shirt, and Clark observed that the van's driver was also wearing a red shirt. Doc. 83 at 15:19–23, 55:2–10. Because the driver matched the description of Leach based upon Clark's observation of the white van, the driver's license photograph on DAVID, and the red shirt, Clark pursued the van. *Id.* at 11:22–25, 15:6–10, 24–25, 16:1–5.

According to Clark, she drove her vehicle out of the driveway, turned right onto Center Road, and traveled eastbound briefly before making a U-turn into the westbound left lane of Center Road to initiate a traffic stop. *Id.* at 24:14–22. She turned on her patrol vehicle's emergency lights as soon as she pulled out of the driveway to initiate the traffic stop. *Id.* at 19:20–25, 20:1. She testified that Allport was behind her

4

in his vehicle. *Id.* at 25:5–7. The van continued to drive west, and Clark followed the van to a traffic light. *Id.* at 19:14–19, 24:21–25. The van then made a U-turn, traveled eastbound, and pulled into the residence's driveway. *Id.* at 19:14–19, 24:23–25, 25:1–5. As a result, Clark "basically made a big circle" in pursuing the van. *Id.* at 25:3–4.

On the other hand, Leach claims in his affidavit that when he drove back to the house from the Venice Food Mart, he observed two patrol vehicles outside the house. Doc. 95 at 1. As a result, he drove past the house and back to the Venice Food Mart. *Id.*[5] When he drove back to the house for the second time, he observed that the patrol vehicles were gone, and he pulled into the driveway. *Id.* Contrary to the testimony of Clark and Allport, Leach asserts that no patrol vehicle pulled behind him for an attempted traffic stop. Doc. 95 at 2.

The parties do not dispute that, at some point, Leach drove the van into the residence's driveway, exited the van, and entered the house. Doc. 83 at 17:20–25, 18:1–10; Doc. 93-1 at 13:8–22. But the parties dispute whether Clark and Allport encountered Leach in the driveway. Clark and Allport testified to the following facts as to that encounter. The van, on which Clark and Allport had attempted to initiate a traffic stop, pulled into the driveway, and Leach exited the van. Doc. 83 at 17:20–24; Doc. 93-1 at 13:20–22. Clark testified that she asked Leach for his driver's license, but he stated that he did not have a driver's license, or something to that effect, and walked

---

[5] Although Leach submitted two affidavits (Docs. 89-1, 95), the later one adds information. As such, the Court will consider that affidavit.

away from Clark and towards the residence. Doc. 83 at 17:20–25, 18:1–5, 11–18. Clark testified that, based upon her earlier searches in DAVID and other databases, she came up with probable cause to believe that Leach was committing a felony by driving while his license was suspended. *Id.* at 56:20–25. Small and Allport commanded Leach to stop. *Id.* at 27:17–19; Doc. 93-1 at 18:16–18. Allport testified that he commanded Leach to stop because the deputies were conducting an investigation into the domestic disturbance and then into Leach's suspended license. Doc. 93-1 at 18:16–25, 19:1–2. Allport issued this command because the deputies wanted to discuss Leach's suspended license with him. *Id.* at 21:13–17. Leach ignored the command and went into the house. *Id.* at 22:4–8. On the other hand, in addition to claiming that no patrol vehicle pulled behind him for an attempted traffic stop, Leach states in his affidavit that no officer contacted him in the front yard; he pulled into the driveway after noticing that the patrol vehicles were gone, entered the house, and sat down to watch television.[6] Doc. 95 at 1.

The parties also do not dispute that Allport and Clark, joined by Deputy Sheriff Karla Small, entered the house and that Leach was sitting in a chair. Doc. 83 at 44:22–25, 45:1; Doc. 84 at 8:2–5; Doc. 93-1 at 27:19–21; Doc. 95 at 2; Doc. 101 at 2. Leach does not dispute Clark's testimony that the deputies wrote citations before entering. Doc. 83 at 27:20–25. Allport testified that, while outside, Clark indicated that they

---

[6] Leach also claims that he has a cell phone video, taken five minutes before his arrest, which does not show any patrol vehicles parked in the front yard or driveway. Doc. 95 at 2. He also claims that he does not acknowledge any contact with the deputies in this video. *Id.* However, Leach has not submitted this video for the Court's review, despite the opportunity to do so.

would "move forward" with the felony DWLS case. Doc. 93-1 at 23:16–23. The three deputies entered the house to issue the citations and arrest Leach for felony driving-while-license-suspended ("DWLS"). *Id.* at 30:5–7; Doc. 83 at 45:16–22. They arrested Leach for felony DWLS. Doc. 101 at 2; Doc. 95 at 17:19–25. While inside the residence, Small tasered Leach once. Doc. 101 at 2.

The parties present differing accounts of what occurred in the house. First, the parties dispute whether Leach's mother opened the door to the house for the deputies. Doc. 93-1 at 24:16–23; Doc. 84 at 8:14–16; Doc. 95 at 2. The following facts are derived from testimony of Allport, Clark, or Small. The deputies approached Leach in the chair, and Allport told him to stand up because he was under arrest for driving with a suspended license. Doc. 93-1 at 27:25, 28:1–3; Doc. 83 at 45:8–15. Leach refused to stand up. Doc. 84 at 9:16–20. When the officers tried to place handcuffs on Leach's left wrist, Leach physically resisted: he clenched his fists, tightened his body, pulled his arms in front of himself, braced and twisted his body, and refused to be handcuffed. Doc. 83 at 44:22–25, 45:1–7; Doc. 84 at 9:16–25, 10:1–4; Doc. 93-1 at 28:8–13, 53:6–13. Leach yelled obscenities at the deputies. Doc. 93-1 at 53:20–25. All three deputies attempted to place Leach in handcuffs. Doc. 84 at 14:4–7. Allport grabbed Leach's wrist "to get into a position" where the deputies "could handcuff [Leach's] right wrist." Doc. 93-1 at 40:14–21. Allport testified that as they stood up and tried to get Leach's right wrist behind his back, Leach tried pulling away and spinning. *Id.* at 41:2–9. A struggle ensued as Allport attempted to pull Leach's wrist behind his back to secure the other handcuff. *Id.* at 57:1–11. Allport tried to get Leach's

right wrist in a wristlock and he, along with Small, stumbled towards the living room wall. *Id.* at 41:2–9.

Small states that she warned Leach that she would taser him if he did not cease resisting. Doc. 84 at 30:14–17. According to Small, Leach replied, "Go ahead and tase me, you f*****g c**t." *Id.* at 30:21–24. She deployed her taser because Leach had been instructed several times to cease resisting and he repeatedly refused to comply. *Id.* at 28:4–7, 33:20–25. Small deployed the taser one time while Leach was standing and up against the living room wall, not while he was on the floor. *Id.* at 14:11–25, 15:1–4. Leach was then placed face down on the floor and the handcuffs were secured. *Id.* at 14:11–15. While Leach resisted, he did not indicate to Small or any other deputy that he had a metal plate in his right arm. *Id.* at 34:21–25; Doc. 93-1 at 33:14–19. Small testified that Leach advised her of medical conditions that he was experiencing only later that day. Doc. 84 at 10:5–7. Leach advised that his arm hurt because he had fallen at work. *Id.* at 35:3–17. On the way to jail, Leach told Small that his arm hurt and referenced a broken arm and an injured back. *Id.* at 20:11–22, 35:8–22. Allport did not notice any injuries on Leach, except for the taser marks. Doc. 93-1 at 55:5–8.

However, Leach states in his affidavit that, upon the deputies' entry into the home, he asked them for a warrant and inquired why they had walked into the home. Doc. 95 at 2. He claims that he did not threaten them. *Id.* He asserts that Allport extracted him from the chair and forced him to the floor, which "caused a great impact and laceration" to his elbow. *Id.* Allport and "the other deputy" tried to straighten his right arm, but Leach explained that he had a metal plate in his arm and that his arm

8

could not straighten. *Id.* Although he asked them to stop, the deputies laughed and continued. *Id.* "One deputy" kneed him in his back, causing "shock waves of pain." *Id.* And Small tasered him while he was lying on the floor in handcuffs. *Id.*

The facts reveal no dispute that, after Leach's arrest, Sergeant Matt Tuggle and Deputy Sheriffs Kyle Poinsett and Kyle Collison arrived to the scene. Doc. 89-7 at 7:5–16, 8:17–22; Doc. 84 at 16:10–15. Tuggle served as a supervisor. Doc. 95 at 7:10–13, 11:1–10. Leach was taken into custody, placed in a patrol vehicle, and transported to jail. Doc. 101 at 2. Small testified to the following facts concerning her escort of Leach to her patrol vehicle, which Leach has not addressed. Small claims that, with Leach handcuffed, she and Collison assisted him to the patrol vehicle. Doc. 84 at 16:23–25, 17:1. According to Small, Leach resisted on the way by dropping his body weight several times, so the deputies picked him up by his arms only. *Id.* at 17:5–17. Leach tried using his legs to avoid being placed into the vehicle. *Id.*

The parties agree that Leach was inside the patrol vehicle with the windows up for approximately 45 minutes before his transport to jail. Doc. 95 at 2; Doc. 84 at 18:19–25, 19:6–7. Leach was transported to jail at 6:34 p.m. Doc. 89-6 at p.12. However, disputes as to the conditions within the vehicle exist. Small testified that the patrol car was running and that she was inside the vehicle. Doc. 84 at 19:3–10. She claims that she completed paperwork, waited for paperwork from other deputies, and waited for her trainee to arrive during that time. *Id.* at 35:23–25, 36:1–10. She also stated that she may have exited the vehicle for a few moments to speak with other deputies, but she was never away from the vehicle. *Id.* at 19:11–15. However, in his

9

affidavit, Leach states that the deputies left him in the hot vehicle, with no air conditioning, and that Small was not in the vehicle. Doc. 95 at 2.[7] Leach denies physically threatening the deputies. *Id.*

### B. Procedural Posture

In the operative complaint, Leach sues Allport, Clark, Small, Collison, Tuggle, Poinsett—each in his or her individual capacity—and Sarasota County Sheriff Kurt Hoffman. *See* Doc. 50 ¶¶8–14. The thirteen-count complaint contains a variety of claims, including excessive-force claims under 42 U.S.C. § 1983 and state-law claims for battery and negligence. Leach previously dismissed "Sarasota County Commissioners" as a defendant from the action (Doc. 53), which resulted in the dismissal of some claims. Hoffman, Allport, Clark, Small, Collison, Tuggle, and Poinsett seek summary judgment on all claims (Doc. 82), which Leach opposes (Doc. 97).[8] The motion is ripe for the Court's review.[9]

---

[7] Although not relevant to the claims, the parties dispute Leach's conduct on the way to the jail. According to Small, Leach threatened that he would "beat [her] ass" when they arrived at the jail, said that he was going to "punch [her] in the face," and called her a "c**t." Doc. 84 at 19:19–25, 20:1–10. Detective Luke Sniegowski , who rode in the vehicle, recalled that Leach was belligerent and cursing. Doc. 89-6 at 12:17–25, 13:1. In his affidavit, Leach denies calling Small "the names she said [he] called her" because "that word makes [him] cringe." Doc. 95 at 2. He also denies telling Small that he would punch her in the face. *Id.*

[8] In his response, Leach buries a request for "expanded discovery" so that he may obtain Clark's "history of written citations." Doc. 97 at 11. The discovery deadline passed before Leach made this request (Docs. 70, 80), and he fails to demonstrate "good cause" under Rule 16. *See* Fed. R. Civ. P. 16(b)(4).

[9] Hoffman, Allport, Clark, Small, Collison, Tuggle, and Poinsett failed to reply to Leach's response in opposition, even though the Case Management and Scheduling Order and the Local Rules afford them leave to do so. Doc. 46 at 7; Local R. M.D. Fla. 3.01(d).

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858

(11th Cir. 2006).[10] Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.   DISCUSSION

The Court will review qualified immunity before turning to Leach's claims.

### A. Qualified Immunity

"To establish the defense of qualified immunity, the burden is first on [the public official] to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). A government official acts within his or her discretionary authority "if the actions were (1) undertaken pursuant to the performance of [his or her] duties and (2) within the scope of [his or her] authority." *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995) (internal quotation marks and alterations omitted). In applying this test, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert*, 157 F.3d at 1282 (internal quotation marks omitted).

---

[10] Unpublished decisions of the Eleventh Circuit are not binding precedent, but may be cited as persuasive authority. 11th Cir. R. 36-2.

Case 8:19-cv-00330-CEH-CPT   Document 110   Filed 03/28/22   Page 13 of 47 PageID 1103

If a defendant establishes that he or she acted within discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate. *Brooks v. Warden*, 800 F.3d 1295, 1306 (11th Cir. 2015). As such, the plaintiff must "satisfy the following two-pronged inquiry: (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Gilmore v. Hodges*, 738 F.3d 266, 267 (11th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). A court may address either prong first. *See Pearson*, 555 U.S. at 236.

A court must "resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313 (11th Cir. 2017) (internal quotation marks omitted). With the facts construed in this manner, the Court "ha[s] the plaintiff's best case" and "material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity." *Id.* (internal quotation marks omitted).

## B. Count I – Excessive Force under 42 U.S.C. § 1983 against Allport, Clark, and Small

In Count I, Leach sues Allport, Clark, and Small for excessive use of force in violation of his rights under the Fourth and Fourteenth Amendments. *See* Doc. 50 ¶120. Clark argues that Leach cannot establish an excessive-force claim because the undisputed facts show that she did not apply physical force against Leach. Doc. 82 at

10. Allport and Small argue that the undisputed facts indicate that the force applied in arresting Leach was objectively reasonable, thereby precluding a Fourth Amendment excessive-force claim. *Id.* at 10–12. And all three deputies argue that even if the undisputed facts demonstrate a constitutional violation, qualified immunity applies because Leach cannot demonstrate that they violated clearly established law. *Id.* at 15–16. While the contours of this claim are unclear because Leach brings the claim against Allport, Clark, and Small, the Court construes this excessive-force claim, as framed by Leach, as arising from his arrest within the residence. As such, the Fourth Amendment, not the Fourteenth Amendment, governs this excessive-force claim. *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).

Because Allport, Clark, and Small have raised qualified immunity as a defense in seeking summary judgment, the Court must analyze qualified immunity as to each deputy.[11] *See Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). The parties do not dispute that Allport, Clark, and Small entered the residence and arrested Leach. The parties also do not dispute that Small was one of the deputies who escorted Leach from the residence to the patrol vehicle. Allport, Clark, and Small each acted within their discretionary authority. *See Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016) ("Here, because Suszczynski was attempting to arrest or restrain Arango, Suszczynski was 'clearly engaged in a discretionary capacity,' which means immunity could attach to his actions."); *Tucker v. Bradshaw*, No. 11-80058-CIV-Ryskamp/Hopkins, 2012 WL

---

[11] Each defendant has raised qualified immunity as an affirmative defense. Doc. 51 at 24.

14

13018592, at *3 (S.D. Fla. Dec. 20, 2012) (stating that a deputy sheriff's "investigation of [the plaintiff] and his decision to arrest and transport him were 'discretionary functions,' carried out in the course of his official job duties"). As such, Leach must show that the deputies violated a constitutional right that was clearly established at the time.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (original emphasis removed).

### i.   *De Minimis Force, Probable Cause, and Arguable Probable Cause*

Application of *de minimis* force, without more, will not support an excessive-force claim in violation of the Fourth Amendment. *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). But while the use of force below a *de minimis* threshold ordinarily will not be actionable, *de minimis* force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect. *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008). To that end, the Court must analyze whether the deputies had probable cause or arguable probable cause. *See id.* (reciting the standards for probable cause and arguable probable cause in the context of analyzing an excessive-force claim and stating "[w]e begin our inquiry, therefore, with the question of whether [the deputy sheriff] had probable cause or arguable probable cause to arrest" the plaintiff). To

15

determine whether probable cause existed, a "reviewing court must simply ask 'whether a reasonable officer *could* conclude . . . that there was a substantial chance of criminal activity.'" *Washington v. Howard*, 2 F.4th 891, 899 (11th Cir. 2022) (alteration and emphasis in original) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). "Probable cause does not require conclusive evidence and is not a high bar." *Id.* (internal quotation marks omitted). As for arguable probable cause, the Eleventh Circuit has previously stated that "[a]rguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendants could have believed that probable cause existed . . . ." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010).

Despite Leach's arrest, the summary judgment record contains few records related to the arrest. But the parties do not dispute that Leach was arrested for felony DWLS or that Allport, Clark, and Small entered the residence to arrest Leach for felony DWLS.[12] Thus, the Court examines whether Clark had probable cause or arguable probable cause to arrest Leach for felony DWLS to determine whether any *de minimis* force was unreasonable.

In 2017, Section 322.34 of the Florida Statutes provided, in relevant part:

---

[12] Allport's and Small's level-of-resistance reports are the only records pertaining to the arrest in the summary judgment record, each of which is attached to that officer's deposition as an exhibit. Small's report indicates that Leach was also charged with resisting without violence. Doc. 84 at 47. This record is consistent with Tuggle's testimony, who indicated during his deposition that the basis for Leach's "detention, arrest and confinement" was "[f]elony driving while license suspended, third [or] subsequent, and two counts of resisting without violence." Doc. 95 at 17:19–25.

> (1) Except as provided in subsection (2), any person whose driver license or driving privilege has been . . . suspended . . . except a "habitual traffic offender" as defined in s. 322.264, who drives a vehicle upon the highways of this state while such license or privilege is . . . suspended . . . is guilty of a moving violation, punishable as provided in chapter 318.
> (2) Any person whose driver license or driving privilege has been . . . suspended . . . except persons defined in s. 322.264, who, knowing of such . . . suspension . . . drives any motor vehicle upon the highways of this state while such license or privilege is . . . suspended . . . upon:
>> (a) A first conviction is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.
>> (b) A second conviction is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.
>> (c) A third or subsequent conviction is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 322.34(1)–(2) (2017).

Section 322.34 also provided that "[t]he element of knowledge is satisfied if the person has been previously cited as provided in subsection (1)"; or the person admits to knowledge of the suspension; "or the person received notice as provided in subsection (4)." *Id.* § 322.34(2). The statute provided a rebuttable presumption that the knowledge requirement was satisfied "if a judgment or order as provided in subsection (4) appear[ed] in the department's records for any case except for one involving a suspension. " *Id.* Subsection (4) stated: "Any judgment or order rendered by a court or adjudicatory body or any uniform traffic citation that cancels, suspends, or revokes a person's driver's license must contain a provision notifying the person that his or her driver['s] license has been . . . suspended." *Id.*[13] Thus, the elements for the offense in

---

[13] The statute also provided that notwithstanding the other provisions of Section 322.34, if a person's driver's license was suspended for "[f]ailing to pay any other financial obligation as

2017 were: (1) license suspension; (2) knowledge of the license suspension; and (3) "actually driving." *Prater v. State*, 161 So. 3d 489, 491 (Fla. 5th DCA 2014).

When viewing the evidence in the light most favorable to Leach and resolving all factual disputes in his favor, the evidence demonstrates that Clark had at least arguable probable cause to arrest Leach. First, Clark explained during her deposition that she conducted a driver's license check on Leach and learned from the search that his license was suspended and that he had three prior convictions for driving while his license was suspended. Because Leach does not dispute these facts in accordance with Rule 56(c), the Court deems these facts undisputed for purposes of the Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2).

For knowledge of the license suspension, the Motion for Summary Judgment argues that Leach's statement in the front yard that he did not have a license indicated to Clark that he knew of the license suspension. Doc. 82 at 14. But under Leach's version of the facts, which the Court must accept, no deputy made contact with him in the front yard. Nonetheless, the statute provided that knowledge of a suspension is met if the driver had been previously cited for driving with a suspended license, as provided in Section 322.34(1). Because the undisputed facts show that Clark learned that Leach had three prior convictions for driving with a license suspended, the knowledge element was met under Florida law. Even if Leach did not have

---

provided in s. 322.245 other than those specified in s. 322.245(1)," upon a second or later conviction for the same offense of knowingly driving with a suspended license, that person committed a misdemeanor of the first degree. Fla. Stat. § 322.34(10)(a)–(b)

knowledge, arguable probable cause does not require an arresting officer to prove every element of an offense. *United States v. Quintana*, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009) ("While the knowledge element may be critical in securing a conviction under Fla. Stat. § 322.34(2), '[n]o officer has a duty to prove every element of a crime before making an arrest.'").

For the final element, Clark testified that she saw Leach driving while situated in the driveway and immediately pursued him, which led the deputies back into the driveway, where they commanded Leach to stop. But Allport testified that Clark advised that she saw the van after they left the scene and that he followed her when she turned her patrol vehicle around to follow it.[14] Under Leach's version of the facts, which the Court must accept as true, he drove by the house once when the police vehicles were parked in the driveway; he drove by a second time when no police vehicles were in the driveway; no patrol vehicle pulled behind him for an attempted traffic stop; he pulled into the driveway without making contact with any deputy.[15]

---

[14] In responding to the Motion for Summary Judgment, Leach highlights this inconsistency between Allport's deposition testimony and Clark's deposition testimony to argue that "the contradictory testimony between Clark and Allport should be left for a jury to decide whose story to believe." Doc. 97 at 13–14. As emphasized, the Court must look to Leach's version of the facts and may determine undisputed facts where a nonmoving party fails to properly address a moving party's assertion of fact. Fed. R. Civ. P. 56(e)(2). The Court will not presently resolve any conflict between this testimony. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict.")

[15] Leach also refers to a cellphone video in his possession, which he claims shows that no patrol vehicle was parked in the front yard or driveway five minutes before his arrest. However, he has failed to provide that video. Further, the Court notes that Leach alleges in the complaint that a white van drove by the residence while Clark researched his driver's

But Leach does not dispute that Clark saw him driving at some point after she researched the parties involved in the domestic dispute. Therefore, at the very least, arguable probable cause existed for the arrest. *See* Fed. R. Civ. P. 56(e)(2). Because arguable probable cause existed for the arrest, any *de minimis* force used by Allport, Clark, or Small will not violate the Fourth Amendment.

### ii.   Whether the Use of Force Was Excessive

Having determined that arguable probable cause existed, the Court turns to whether the force used by Allport, Clark, or Small was excessive. According to Leach, Allport, Clark, and Small entered the residence through the unlocked front door. He asked them for a warrant and inquired why they had entered the residence, but he did not threaten them.[16] The deputies then used force in arresting him: Allport forced him

---

license; Clark and Allport saw the van and pulled their patrol vehicles behind the van; and Clark and Allport attempted a traffic stop on the van, but the van had pulled into the driveway. Doc. 50 ¶¶ 21–23. Regardless, these contrary allegations do not change the analysis, as the Court must look to the evidence in determining the facts in ruling upon the Motion for Summary Judgment.

[16] In both his complaint and his response to the Motion for Summary Judgment, Leach references the deputies' warrantless entry into the residence. A warrantless entry into a home is unreasonable and, therefore, violates the Fourth Amendment, subject to two exceptions: consent and exigent circumstances. *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007). Here, the deputies did not have a warrant to enter the residence. They contend that Leach's mother gave them consent to enter, but Leach states that she did not let them in and that she was in her bedroom when they entered. However, Leach does not bring a separate claim against Allport, Clark, or Small for violation of his Fourth Amendment rights resulting from a warrantless entry. *See*, *e.g.*, *Walters v. Freeman*, 572 F. App'x 723, 725–26 (11th Cir. 2014) (analyzing separate claims for excessive force and warrantless entry in violation of the Fourth Amendment); *Bratt v. Genovese*, No. 8:13-cv-3210-CEH-AEP, 2015 WL 12835684, at *4–7 (M.D. Fla. Nov. 23, 2015) (same), *aff'd*, 660 F. App'x 837 (11th Cir. 2016). Leach also does not allege or argue that the deputies applied excessive force *because* any force used in an illegal arrest is necessarily excessive. *See Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1331–1332 (11th Cir. 2006) ("[W]here an excessive force claim is predicated solely on allegations that the

to the floor; Allport and another deputy forced his arm to straighten, even though he told them about the metal plate in his arm and informed them that his arm did not straighten; one deputy kneed him in the back; and Small tasered him. The Court must evaluate that force under the Fourth Amendment's reasonableness standard, asking whether the force applied was objectively reasonable in light of the facts confronting the officer, which is a determination from the perspective of a reasonable officer on the scene, "not 'with the 20/20 vision of hindsight.'" *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015).

Determining whether the force used to effect a particular seizure is "reasonable" requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Lee*, 284 F.3d at 1197 (internal quotation marks omitted). Balancing the necessity of using some force against the arrestee's constitutional rights entails consideration of several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 1197–98 (internal quotation marks omitted). Other considerations include the need for

---

arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim."). Rather, he claims the force was excessive because of the injuries that he sustained from that force, including Small's use of the taser. The Court will not rewrite the complaint for Leach to bring a claim against the officers for violation of the Fourth Amendment as a result of a warrantless entry. *See Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014) (stating that the leniency afforded to *pro se* litigants does not give a court license to rewrite an otherwise deficient pleading to sustain an action).

the application of force, the relationship between the need and the amount of force used, and the extent of the inflicted injury." *Mobley*, 783 F.3d at 1353. The Eleventh Circuit has rejected the argument that force administered by each defendant in a collective beating must be analyzed separately. *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007).

Upon review, Leach fails to establish a constitutional violation here. First, DWLS is not a severe offense. Because more force is appropriate for a more serious offense and less force is appropriate for a less serious offense, this factor weighs in Leach's favor. *See Lee*, 284 F.3d at 1198. Next, based on Leach's account of the facts, he did not pose an immediate threat to the safety of the deputies or anyone else. He did not threaten the deputies, and he was watching television when they entered the residence and approached him. Thus, this factor weighs in Leach's favor. Under the third factor, the Court must consider whether Leach actively resisted arrest or attempted to evade arrest. Allport, Clark, and Small discussed, extensively, Leach's resistance to the arrest during their depositions, which are offered in support of the Motion for Summary Judgment. In his affidavit, Leach does not rebut this testimony. He does not refute the testimony that he clenched his fists, tightened his body, braced and twisted his body, pulled away, and refused to be handcuffed, except by stating that he told the deputies that his arm did not straighten. But this fact does not rebut the extensive deposition testimony of the deputies concerning the extent of Leach's resistance. Thus, the undisputed facts show that Leach resisted the arrest. *See* Fed. R. Civ. P. 56(e)(2). To that end, some force was required because Leach was resisting

arrest. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) ("[W]e recognize that the typical arrest involves some force and injury.").

As for the extent of the inflicted injuries, Leach's affidavit states only that he sustained a laceration on his elbow when Allport forced him to the floor. Leach also provides numerous medical records, although those records discuss medical conditions only generally and do not link the medical conditions to his arrest, nor does Leach argue such in his response.[17]

"What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time." *Rodriguez*, 280 F.3d at 1353. For example, in *Rodriguez*, an officer grabbed the plaintiff's arm; twisted it around the plaintiff's back; handcuffed the plaintiff as the plaintiff fell to his knees, screaming that the officer was hurting him; and placed the plaintiff in a patrol vehicle while the plaintiff was handcuffed. *Id.* at 1351. The plaintiff's arm below the elbow was amputated as a result of the incident. *Id.* But the plaintiff admitted that he did not tell the officer that he had an injured arm and nothing outwardly indicated that his

---

[17] Leach only lists the medical evidence and states that the "laceration to [his] elbow shows he took a severe blow to his right elbow." Doc. 97 at 7. Leach also provides an unsigned opinion entitled "Unsigned Draft Confidential Work Product | Expert Witness Report," which states that Leach "sustained painful hardware of his right elbow, right cubital tunnel and carpal tunnel syndromes, a rotator cuff tear and labral tear of his right shoulder and an umbilical hernia, as a direct result of the assault by three deputies in 2017." Doc. 95 at 4. However, this document is unauthenticated and appears to be some type of draft report, rather than a finalized document. *See* Fed. R. Evid. 901, 902. For purposes of this motion for summary judgment, the Court has not considered this report. Leach concedes that "he financially is unable to pay for the signed medical opinion." Doc. 97 at 7.

arm was injured. *Id.* at 1353. The Eleventh Circuit concluded that the officer's acts could not constitute a constitutional violation. *Id.* On the other hand, the Eleventh Circuit has reversed summary judgment in favor of an officer on an excessive-force claim where: the plaintiff claimed to have informed the officer almost immediately that he suffered from a bad shoulder; the officer was accused of intentionally focusing on the sore shoulder as to inflict further pain; and at least three instances had occurred where the officer intentionally grabbed, pushed, or pulled on the plaintiff's shoulder after he was handcuffed and forcing him to the ground by intentionally applying stress to the shoulder. *Davis v. Williams*, 451 F.3d 759, 767–68 (11th Cir. 2006). Here, the facts indicate only that Leach told the deputies about the metal plate in his arm and that his arm did not straighten, but they continued to straighten his arm and laughed. The facts do not indicate that the deputies knew the extent of his injury or that they intentionally focused on his arm to inflict further pain.

Thus, although DWLS is not a severe offense and Leach did not initially pose harm to Allport, Clark, or Small when they entered the residence, he resisted arrest. A reasonable officer would not believe that forcing an individual to the floor, trying to straighten the individual's arm to handcuff him, and kneeing that individual in the back would constitute excessive force where the individual was resisting arrest by clenching his fists, tightening his body, bracing and twisting his body, pulling away, and spinning. Because Leach fails to show that Allport, Clark, and Small committed a constitutional violation for those actions, the deputies are entitled to qualified immunity.

24

Small is also entitled to qualified immunity for deploying her taser because Leach has not shown that, by deploying her taser, she violated his Fourth Amendment rights. In a "difficult, tense and uncertain situation," the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (internal quotation marks omitted). To be sure, the Court must resolve all issues of material fact in Leach's favor. But in the face of overwhelming testimony about his resistance to the deputies, Leach provides a two-page affidavit, in which he simply states that: Allport extracted him from the chair, when he asked the deputies to stop, they laughed and continued; another deputy kneed him in the back; and Small tasered him as he was lying down in handcuffs. The affidavit is conclusory and offers sparse facts. Leach neither refutes the testimony of the officers describing his acts of resistance, nor explicitly states that he did not resist; he states only that he was lying down on the floor in handcuffs when he was tased. As discussed above, Leach resisted arrest. Leach's version of the facts is insufficient to establish that Small's deployment of the taser violated his Fourth Amendment rights. *See Buckley v. Haddock*, 292 F. App'x 791, 798 n.12 (11th Cir. 2008) (citing cases for the proposition that "an officer may not use force against an arrestee who was handcuffed and who was not resisting arrest"); *see Mobley*, 783 F.3d at 1356 ("But force applied while a suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive."). Leach's version of the facts does not show that Leach was "handcuffed and pose[d] no risk of danger to the

25

officer[s]." *Id.* (internal quotation marks omitted). A reasonable officer in Small's position would not believe that one application of the taser would constitute excessive force. As such, Small is entitled to qualified immunity for deploying her taser.

Finally, to the extent that Leach bases this claim on his escort to Small's patrol vehicle or his time in the back of the vehicle, Small is also entitled to qualified immunity. Small testified that she and Collison escorted Leach to the patrol vehicle while he was handcuffed and that he resisted by dropping his weight several times, which resulted in the deputies picking him up by his arms only. Leach does not address his escort to the patrol vehicle in his affidavit. As such, the undisputed facts show that Leach resisted during the escort and that the deputies had to pick him up by his arms only. These actions do not constitute a constitutional violation. *See Nolin*, 207 F.3d at 1257 ("[A]pplication of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment"). Small is entitled to qualified immunity for any force used while escorting Leach to the patrol vehicle.

And to the extent that Leach bases this claim upon his time in the patrol vehicle, "[l]eaving a [person] in an unventilated police car in extreme temperatures for a long period of time can give rise to a Fourth Amendment violation," but leaving someone "in an unventilated vehicle in the hot sun for periods of ten and thirty minutes does not violate the Fourth Amendment." *Borsella v. Parker*, No. 6:11-cv-1249-JA-GJK, 2013 WL 375480, at *4 (M.D. Fla. Jan. 31, 2013) (collecting cases and finding that a deputy sheriff did not violate the Fourth Amendment when confining the plaintiff in a police car for approximately 35 minutes on a hot day with the windows up and

without air-conditioning). There is no dispute that Leach was inside the "hot" patrol vehicle, with the windows up, for "almost 45 minutes" on a February evening. Doc. 95 at 2. Under Leach's version of the facts, the vehicle's air conditioning was turned off and Small was not inside the vehicle. But Leach does not present evidence that his time in the back of the vehicle caused injuries.[18] A reasonable officer in Small's position would not believe that leaving an individual in a "hot" patrol vehicle with the windows up and the air conditioning turned off for "almost 45 minutes" on a February evening in Sarasota, FL, would constitute excessive force.

Even assuming a constitutional violation, such violation was not "clearly established" at the time of the conduct. For determining whether a reasonable officer would know that her conduct was unconstitutional, two methods exist: if, in looking at relevant case law at the time, a concrete factual context exists to render it obvious; or if the conduct lies so obviously at the core of the conduct prohibited by the Fourth Amendment that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law. *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011). The Eleventh Circuit did not directly confront a "hot car" case until last year. *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1182 (11th Cir. 2020). The Court has not found, nor has Leach cited to, any controlling precedent squarely governing the specific facts here and this type of conduct does not so obviously lie at the core of

---

[18] Leach argues in his response that he "experienced a significant focus on the physical symptoms during the transport" and that the "severity of the pain from the defendants' actions left [him] in major distress" and caused "shortness of breath" and "weakness." Doc. 97 at 4. However, these arguments are not evidence.

the conduct prohibited by the Fourth Amendment so as to be readily apparent. *See*, *e.g.*, *Borsella*, 2013 WL 375480, at \*4; *Emmerick v. City of Gatlinburg*, No. 3:08-cv-305, 2010 WL 3861047, at \*4 (E.D. Tenn. Sept. 24, 2010) ("[T]he Court finds that the defendants did not violate a clearly established constitutional right when they left plaintiff in an unventilated police car for 30 minutes" with the windows rolled up and no air conditioning); *Burchett v. Keifer*, 310 F.3d 937, 945 (6th Cir. 2002) (finding a Fourth Amendment violation where the plaintiff-appellant was detained in a police car with the windows rolled up in ninety degree heat for three hours). As such, Small is entitled to qualified immunity to the extent that he premises this claim on his time in the back of the patrol vehicle.

Therefore, the Court will enter summary judgment in favor of Allport, Clark, and Small on Count I.

### C. Count II – Excessive Force under 42 U.S.C. § 1983 against Poinsett and Collison

In Count II, Leach sues Poinsett and Collison under § 1983 for excessive use of force in violation of the Fourth and Fourteenth Amendments. *See* Doc. 50 ¶132. Poinsett and Collision argue that Leach cannot establish an excessive-force claim against them because the undisputed facts show that they applied no physical force to Leach. Doc. 82 at 10. They also argue that even if the undisputed facts could demonstrate a constitutional violation, Leach cannot show that they violated clearly established law. *Id.* at 15. The Court agrees.

Leach alleges that Poinsett and Collison engaged in "another unprovoked attack" by picking him up from the floor by the chain of the handcuffs and rushing him out to the patrol vehicle. Doc. 50 ¶58. Poinsett and Collision allegedly continued to pull up on Leach's arms while escorting him to the patrol vehicle, with the handcuffs "cut[ting] through the skin" and the "unreasonable force" creating "significant stress and strain" to Leach's left wrist and right elbow. *Id.* at ¶60. Leach also alleges that Poinsett and Collison "stuffed" Leach into the back seat of the patrol vehicle, "leaving him lying on his stomach between the seat and floor," unattended with no air conditioning and all windows closed for approximately 40 minutes. *Id.* at ¶63.

The evidence in the record demonstrates only that Poinsett and Collison arrived to the scene after Leach's arrest and that Collision, along with Small, escorted him to the patrol vehicle. Poinsett and Clark acted within their discretionary authority. *See Perez*, 809 F.3d at 1218; *Tucker*, 2012 WL 13018592, at *3. As such, Leach must show that Poinsett and Collison violated a constitutional right that was clearly established.

For Poinsett, no evidence shows that Poinsett picked up Leach by the chains of the handcuffs, escorted him to the patrol vehicle, or pulled on his arms while escorting him. The evidence also does not show that Poinsett "stuffed" Leach into the back of the vehicle. The evidence shows only that Poinsett arrived to the scene after Leach's arrest. Thus, Poinsett is entitled to qualified immunity for this claim, and the Court will enter summary judgment in favor of Poinsett on this claim.

As for Collision, the evidence shows that he escorted Leach to the patrol vehicle. As mentioned in the discussion for Count I, the undisputed facts show that

29

Leach resisted during the escort to the vehicle and that Small and Collison had to pick him up by his arms only. For the same reasons discussed above in finding that Small is entitled to qualified immunity for any force used while escorting Leach to the vehicle, Collision is entitled to qualified immunity for any force used while escorting Leach. *See Nolin*, 207 F.3d at 1257. Finally, for the same reasons that Small is entitled to qualified immunity for Leach's time in the back of the vehicle, Collision is entitled to qualified immunity for Leach's time in the vehicle.

Therefore, the Court will grant summary judgment in favor of Poinsett and Collison on this claim.

### D. Count III – Excessive Force under 42 U.S.C. § 1983 against Tuggle

In Count III, Leach sues Tuggle individually under § 1983 for excessive use of force in violation of his rights under the Fourth and Fourteenth Amendments. *See* Doc. 50 ¶144. Tuggle argues that the undisputed facts show that he applied no physical force to Leach and, even if the facts demonstrated a constitutional violation, Leach cannot show that the violation was clearly established. Doc. 82 at 10, 12. The Court will grant summary judgment in favor of Tuggle on this claim.

In bringing this claim, Leach alleges that Tuggle was acting in a "supervisory capacity as a Sarasota County Deputy Sheriff." Doc. 50 ¶143. Leach premises Tuggle's liability on Tuggle "st[anding] by and permit[ting] the use of force . . . which was objectively unreasonable in light of the facts and circumstances confronting him and other defendants . . ." *Id.* at ¶146. And he premises the claim upon "Tuggle's actions and authorization to use a taser" against Leach. *Id.* at ¶147.

The undisputed facts show that Tuggle was a supervisor and arrived to the scene after Leach's arrest. He responded to the scene because the deputies "asked for a supervisor to respond due to a taser deployment." Doc. 95 at 7:10–13. He testified that his duties in this instance involved ensuring that the taser probe areas were photographed and that the appropriate paperwork was completed. *Id.* at 11:5–10. He sat in his patrol vehicle for most of that time, but also spoke with Allport and Clark about the incident, ensured that the taser probe picture was taken, that the proper paperwork was completed, and developed a plan for Small to transport Leach to the jail. *Id.* at 9:19–22, 25:23–25, 26:1–9. He also generally acknowledged responsibility for his deputies as a supervisor. *Id.* at 15:2–11. Because Tuggle undertook these actions in accordance with the performance of his duties and within the scope of his authority, he was acting within his discretionary authority. *See Lenz*, 51 F.3d at 1545.

Thus, the burden shifts to Leach to show a clearly established constitutional violation. Tuggle correctly points out that the undisputed facts show that he did not apply any physical force to Leach. In his affidavit, Leach does not mention Tuggle. Leach apparently grounds this excessive-force claim on Tuggle's role as supervisor.

But "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (internal quotation marks omitted). To hold Tuggle, as a supervisor, liable for a constitutional violation, Leach must show that Tuggle "either participated directly in the unconstitutional conduct or that a causal connection exists between [Tuggle's] actions and the alleged

31

constitutional violation." *Id.* The requisite causal connection "can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Id.* (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)). "Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to the constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (alterations in original). "'[T]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous.'" *Id.* (alteration in original).

Tuggle cannot be held liable for the actions of the deputies inside the residence on the basis of respondeat superior or vicarious liability. Further, the undisputed facts show that Tuggle did not participate in the arrest, which involved Small's deployment of the taser. Leach also fails to show a causal connection between Tuggle's actions and any violation of Leach's rights under the Fourth or Fourteenth Amendments under either causal avenue. To the extent that Leach bases this claim upon force used during his escort to Small's vehicle, Tuggle testified that Leach was already outside the house when he arrived to the scene. Doc. 95 at 10:6–8. Leach does not show Tuggle's participation or the requisite causal connection.

As for his time in Small's vehicle, Leach highlights Tuggle's testimony that leaving someone in the back of a patrol car with no air conditioning and the windows

closed "for close to 48 minutes" would be unreasonable. Doc. 97 at 9–10. But the law determines reasonableness, not Tuggle's opinion, and this testimony also does not establish Tuggle's participation or the requisite causal connection.[19] Referencing Tuggle's testimony, Leach claims that Tuggle testified that he never checked on Leach while Leach was in the back of the vehicle, despite knowing of "a taser incident and possible side effects." *Id.* at 10. Even if Tuggle's testimony is construed in this manner, this testimony does not show any participation by Tuggle or the requisite causal connection. And a review of the record does not demonstrate any evidence of such participation or causal connection.

Therefore, because Leach fails to establish a constitutional violation, Tuggle is entitled to qualified immunity on this claim, and the Court will enter summary judgment in Tuggle's favor.

### E. Count IV – First Amendment Retaliation under 42 U.S.C. § 1983 against Allport, Clark, Small, and Tuggle

In Count IV, Leach sues Allport, Clark, Small, and Tuggle for First Amendment retaliation under § 1983. Allport, Clark, Small, and Tuggle argue that the decision to arrest Leach preceded his allegedly protected speech, thereby negating the requisite causation, and, even if the undisputed facts show a constitutional violation, Leach cannot show that the violation was clearly established. Doc. 82 at 12.

---

[19] Similarly, Leach's reference to Tuggle's testimony concerning whether Leach's offense was "an arrestable offense" if Leach did not know that his license was suspended does not show a constitutional violation here. Doc. 97 at 10.

In framing this claim, Leach alleges that in response to his questioning of the deputies' entry into the residence, Allport, Small, and Clark violently extracted him from his chair and forced him to the ground, with Allport remarking, "There's your warrant." Doc. 50 ¶¶29–30. Leach claims that this comment shows "[r]etaliatory animus" and that his questioning of the deputies was a substantially motivating factor in the use of excessive force. *Id.* at ¶159. Leach claims that they participated in the use of force as a means of retaliation for Leach's speech. *Id.* at ¶161.[20]

Beginning with Tuggle, he was acting within his discretionary authority for the reasons mentioned in the discussion of Count III. As such, the burden shifts to Leach. To establish a First Amendment retaliation claim, Leach "must demonstrate that (1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). Causation standards vary depending on the nature of the First Amendment retaliation claim. For example, for a retaliatory-prosecution claim, a plaintiff must establish a "but-for" causal connection, which involves both pleading and proving (1) a retaliatory motive on the part of the defendant and (2) the absence of probable cause. *Rehberg v.*

---

[20] Leach also alleges that Allport, Clark, Small, and Tuggle are liable "for the injuries and damages resulting from the objectively unreasonable and conscience-shocking force of each other officer" because they did not take any reasonable steps to protect him from the retaliation. *Id.* at ¶161. In the excessive-force context, the Eleventh Circuit has recognized that "[a] non-arresting officer may be liable for another officer's use of excessive force, but only if the non-intervening officer was in a position to intervene yet failed to do so." *Brown*, 608 F.3d at 740 n.25. But this claim is for First Amendment retaliation, not excessive force.

*Paulk*, 611 F.3d 828, 848–49 (11th Cir. 2010). In the employment context, "the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). Regardless of which causation road the Court travels down, the evidence does not show any causal connection between Leach's questioning of the deputies and a retaliatory action by Tuggle. To the extent that Leach premises this claim against Tuggle on Tuggle's supervisory authority, Tuggle is entitled to qualified immunity for the reasons outlined in the discussion of Count III. As such, Tuggle is entitled to qualified immunity for this claim.

Next, Allport, Clark, and Small acted within their discretionary authority for the reasons discussed above. Despite Leach's allegations, the evidence does not show that Allport said, "There's your warrant" after Leach questioned the deputies' entrance into the residence. Further, the evidence does not support, nor does Leach point to anything in the record indicating, that his questioning of the deputies was a substantially motivating factor in the use of excessive force. He fails to establish a causal connection between the force used by Allport, Clark, and Small and his speech. Thus, Allport, Clark, and Small are entitled to qualified immunity for this claim.

Therefore, because Allport, Clark, Small, and Tuggle are entitled to qualified immunity here, the Court will enter summary judgment in their favor on this claim.

**F. Count V – Malicious Prosecution under 42 U.S.C. § 1983 against Allport, Clark, Small, and Tuggle**

In Count V, Leach sues Allport, Clark, Small, and Tuggle under § 1983 for malicious prosecution in violation of his Fourth and Fourteenth Amendment rights. Allport, Clark, Small, and Tuggle contend that arguable probable cause existed for charging Leach "with several offenses, including felony DWLS and resisting an officer without violence." Doc. 82 at 14. They argue that even if the undisputed facts demonstrate a constitutional violation, qualified immunity applies because Leach cannot show a violation of clearly established law. *Id.* at 15. The Court will enter summary judgment in favor of Allport, Clark, Small, and Tuggle on this claim.

In framing this claim, Leach contends that he had a "constitutional right to be free from malicious prosecution without probable cause under the Fourth Amendment and in violation of due process under the Fourteenth Amendment." Doc. 50 ¶171. He alleges that Allport, Clark, Small, and Tuggle violated his "Fourth and Fourteenth Amendment rights to be free from malicious prosecution without probable cause and without due process when they worked in concert to secure false charges against him, resulting in his malicious prosecution." *Id.* at ¶173. He claims that certain criminal proceedings were ultimately terminated in his favor and that the prosecutor "decline[d] one resisting charge and the other would be dismissed by the Court pursuant to the Motion to Suppress." *Id.* at ¶179. He also alleges that the prosecutor stipulated to the facts in that motion, thereby reflecting a "prosecutorial judgment that the case could not be proven beyond a reasonable doubt." *Id.* at ¶179.

Allport, Clark, Small, and Tuggle acted within their discretionary authority. *See Lenz*, 51 F.3d at 1545. Thus, the burden shifts to Leach. The analysis proceeds under

the Fourth Amendment. *Rehberg*, 611 F.3d at 853 ("A malicious prosecution claim arises under the Fourth Amendment, not Fourteenth Amendment substantive due process."). "To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). The elements of the common law tort of malicious prosecution are: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused."[21] *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010).

Here, Leach provides no evidence to support the elements of common-law malicious prosecution—he fails to demonstrate a criminal prosecution that was terminated in his favor and caused damage to him, let alone an action initiated with malice and without probable cause. A motion to suppress is attached to his complaint, but this record is the only record supplied from the state action. To be sure, Leach's allegations reference the state action, such as his allegations transcribing a portion of the hearing on the motion to suppress and his allegations that the state court accepted

[21] Although the Eleventh Circuit has utilized the six elements of a malicious-prosecution claim under Florida law in some § 1983 actions, *Grider* more recently set forth the elements listed here and noted that "[w]hen malicious prosecution is brought as a federal constitutional tort, the outcome of the case does not hinge on state law, but federal law, and does not differ depending on the tort law of a particular state." 618 F.3d at 1256 n.24. The four elements listed above are "in essence the same as Florida's elements." *Olin v. Scales*, No. 6:12-cv-1455-JA-TBS, 2014 WL 1621952, at *5 n.10 (M.D. Fla. Apr. 22, 2014).

his "nolo plea on the DWLS and withheld judgment on that charge." Doc. 50 ¶¶94–95. But Leach must produce evidence, not allegations, to support his claims at this stage of the litigation. *See A.L. by and through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) ("The nonmoving party may not rest upon the mere allegations or denials of his pleading."). Leach's assertions in the body of his response, without supporting evidence, are also insufficient. No party has attempted to direct the Court to records of which the Court may take judicial notice, either.[22] In the absence of evidence supporting this claim, Leach fails to establish a constitutional violation, and Allport, Clark, Small, and Tuggle are entitled to qualified immunity.

Therefore, the Court will enter summary judgment in favor of Allport, Clark, Small, and Tuggle on this claim.

### G. Count VI – "Deliberate Indifference" by the Sheriff for "Policies, Practices, Customs, Training, and Supervision"

In Count VI, Leach brings a claim under § 1983 for deliberate indifference against Knight for "Policies, Practices, Customs, Training, and Supervision" in violation of his Fourth and Fourteenth Amendment rights. Doc. 50 at 28. Leach premises this claim upon the "deficient training" of Clark, Allport, Small, and Tuggle, which "led to [his] false arrest." *Id.* at ¶187. Leach alleges that Clark, Allport, Small, and Tuggle received deficient training because a certified driving record did not support his arrest for felony DWLS. *Id.* at ¶¶187–189. He alleges that the

---

[22] In reciting facts concerning the state action, the Motion for Summary Judgment relies upon Leach's allegations, Doc. 82 at 7, which were denied in the answer, Doc. 51 at 7.

circumstances concerning his lack of knowledge, and lack of notice, undermine any arrest for DWLS. *Id.* at ¶190. And in responding to the Motion for Summary Judgment, Leach argues that "the defendants" either "deliberately ignored the law by charging [him] with DWLS" or were "not adequately trained by Defendant Knight in [P]olicy PAT 120.06," which, according to Leach, addresses procedures for handling persons charged with DWLS. Doc. 97 at 11. Because the Court construes this claim as an official-capacity claim, the claim is against Hoffman.[23] Thus, the Court construes this claim as a § 1983 claim against Hoffman, in his official capacity as Sarasota County Sheriff, for violating Leach's Fourth and Fourteenth Amendment rights based on a deliberate-indifference failure-to-train theory.

This claim against Hoffman in his official capacity is effectively a claim against the governmental entity that Hoffman represents. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1115 (11th Cir. 2005). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law [or the Constitution]." *Troupe v. Sarasota Cnty.*, No. 8:02-cv-53-SCB-MAP, 2004

---

[23] The Motion for Summary Judgment construes Counts VI, VII, VIII, and IX as raising only official-capacity claims. Doc. 82 at 1 n.1. In responding, Leach does not dispute this characterization. As discussed herein, the Court also construes Counts VI, VII, VIII, and IX as raising only official-capacity claims. Even if Leach intends for Counts VI, VII, VIII, or IX to serve as an individual-capacity claims against Knight under § 1983 for supervisory liability, entry of summary judgment for Knight on any of those claims would be appropriate because Leach fails to show that Knight directly participated in unconstitutional conduct or that a causal connection exists between Knight's actions and a constitutional violation. *See Harrison*, 746 F.3d at 1298.

WL 5572030, at *13 (M.D. Fla. Jan. 22, 2004) (alteration in original) (internal quotation marks omitted).[24]

"[A] governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation," and, thus, "in an official-capacity suit, the entity's 'policy or custom' must have played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); *see Martin v. Wood*, 648 F. App'x 911, 914 (11th Cir. 2016) (reciting this rule where a plaintiff brought an official-capacity claim against a Florida sheriff under § 1983). "In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice." *McDowell*, 392 F.3d at 1290.

---

[24] "Determining the entity a Florida sheriff represents in a section 1983 official capacity suit has proven problematic." *C.P. by and through Perez v. Collier Cnty.*, 145 F. Supp. 3d 1085, 1097 (M.D. Fla. 2015). Florida sheriffs are elected officials who exercise independent control over many matters, "including the selection of personnel and the hiring, firing, and setting salaries of such personnel." *Edwards v. City of Ft. Myers*, No. 2:19-cv-711-SPC-NPM, 2021 WL 1627475, at *7 (M.D. Fla. Apr. 27, 2021) (citing Fla. Stat. § 30.53). "In Florida, a county has no authority and control over a sheriff's law enforcement function." *Troupe v. Sarasota Cnty.*, No. 8:02-cv-53-SCB-MAP, 2004 WL 5572030, at *13 (M.D. Fla. Jan. 22, 2004). *But see Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1115 (11th Cir. 2005) ("When, as here, the defendant is the county sheriff, the [§ 1983] suit is effectively an action against the governmental entity he represents—in this case, Monroe County.").

But a plaintiff may also prove a policy "by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.*; *see Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 820 (11th Cir. 2017) (applying these deliberate-indifference standards in an action against a county).

The Sheriff argues that Leach has not established a constitutional violation, a policy or custom, or deliberate indifference. Doc. 82 at 16–20. As discussed above, Leach has not established a constitutional violation. And Leach has not demonstrated any custom or policy that constituted deliberate indifference to his Fourth or Fourteenth Amendment rights or that such policy or custom caused a violation of those rights. He has failed to present any evidence of knowledge of a need to train or supervise or a deliberate choice not to take action. Although he cites to Policy PAT 120.06 in his response, he fails to provide a copy of that policy. Nonetheless, the assertion that Allport, Clark, Small, and Tuggle were inadequately trained in Policy PAT 120.06 fails to show the requisite evidence of deliberate indifference. Ultimately, Leach claims that Allport, Clark, Small, and Tuggle received "deficient training" because of circumstances "call[ing] into question [his] arrest for DWLS." Doc. 50 ¶¶ 187, 190. In the absence of any evidence of the requisite custom or policy, or that the policy or custom was a "moving force" for a constitutional violation, Hoffman is

41

entitled to summary judgment in his favor on this claim. *See Gold*, 151 F.3d at 1350 (explaining that a defendant "is not automatically liable" under § 1983 even if it inadequately trained or supervised its police officers and those officers violated [a plaintiff's] constitutional rights"). Therefore, the Court will enter summary judgment in Hoffman's favor on this claim.

### H. Count VII – "Deliberate Indifference" by the Sheriff for "Failing to Equip Deputies with Body Cam[eras]"

Here, Leach brings a claim under § 1983 for deliberate indifference against Knight for "Failing to Equip Deputies with Body Cam[eras]." Doc. 50 at 30. Leach alleges that "the individual defendants" were not equipped with body cameras because "Knight said no to them." *Id.* at ¶199. He claims that his constitutional rights would not have been violated if Allport, Clark, Small, Tuggle, Poinsett, and Collison had been equipped with body cameras. *Id.* at ¶200. Knight allegedly maintains a policy of not equipping deputies with body cameras. *Id.* at ¶201. Leach does not specify which constitutional rights were violated. But, as discussed above, Leach's constitutional rights were not violated. The Court construes this claim as a claim under § 1983 against Hoffman, in his official capacity as Sarasota County Sheriff, for an allegedly unconstitutional policy or custom.[25]

---

[25] Leach references "deliberately indifferent training and supervision" and a "failure to supervise" in this claim. Doc. 50 ¶¶203–204. But based on the allegations above, the Court does not construe this claim as raising a deliberate-indifference failure-to-train theory. Even if the Court did construe this claim as arising under that theory, entry of summary judgment in Hoffman's favor is warranted for the same reasons set forth in the discussion of Count VI.

In seeking summary judgment on this claim, the Sheriff replicates his argument for Count VI. Doc. 82 at 16–20. Leach has not shown any evidence of a policy or custom of not equipping deputies with body cameras. Leach has not shown that such a policy or custom was a "moving force" behind a violation of a constitutional right, either. At this stage of the litigation, Leach must produce evidence, not allegations, to support his claims. *See Walt Disney Parks & Resorts US*, 900 F.3d at 1289. Therefore, the Court will enter summary judgment in Hoffman's favor on this claim.

## I.  Count VIII – "Deliberate Indifference" by the Sheriff's "Training, and Supervisory Liability"

In Count VIII, Leach brings a claim under § 1983 for "Deliberate Indifference by Knight's Training, and Supervisor Liability" in violation of his Fourth and Fourteenth Amendment rights. Doc. 50 at 32. Leach alleges that Knight violated his Fourth Amendment right to be free from excessive force and his right to substantive due process under the Fourteenth Amendment when he failed to adequately train deputies "in the constitutional limitations of conducting a warrantless entry into a person's home without consent [or] exigent circumstances." *Id.* at ¶208. He claims that Knight, as a chief policymaker, bears responsibility for training "to maintain an effective police force that is capable and prepared to deal with encounters with non-threatening people" and that the deputies' conduct at the scene was "contrary to established police methods for interacting with non-threatening persons." *Id.* at ¶¶209–10. And he claims that no deputies were sufficiently trained to "reasonably and effectively deal with [his] medical situation." *Id.* at ¶212. As such, Leach bases this

43

claim on Knight's purported failure to train deputies in constitutional limitations and medical care. Therefore, like Count VI, the Court construes this claim as a claim under § 1983 against Hoffman, in his official capacity as Sarasota County Sheriff, for allegedly violating Leach's Fourth and Fourteenth Amendment rights based on a deliberate-indifference failure-to-train theory.

In seeking summary judgment here, the Sheriff replicates his argument for Counts VI and VII. Once again, Leach has failed to provide evidence of a custom or policy that constituted deliberate indifference to Fourth or Fourteenth Amendment rights or that such policy or custom caused a violation of those rights. He has again failed to present any evidence of knowledge of a need to train or supervise or a deliberate choice not to take action. Therefore, the Court will enter summary judgment in Hoffman's favor on this claim.

### J. Count IX – Deliberate Indifference" by the Sheriff for "the implementation of Unconstitutional Written General Order 22.6"

In Count IX, Leach brings a claim under § 1983 for "Deliberate Indifference" by Knight "for the implementation of Unconstitutional Written General Order 22.6." Doc. 50 at 34. Leach alleges that General Order 22.6, which allegedly is a "written policy that deals with the use of a taser," is unconstitutional because the order gives discretion to an individual deputy to determine when to order medical assistance for a person who has been tased. Doc. 50 ¶¶217–219.

The Sheriff repeats his argument for Counts VI, VII, and VIII. "A policy is a decision that is officially adopted by the municipality, or created by an official of such

rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citing *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1479–80 (11th Cir. 1991)). Despite alleging that the Sheriff implemented an unconstitutional order, the record lacks any evidence of General Order 22.6. The only mention of General Order 22.6 in the evidence is Tuggle's vague reference to "General Order 22," in which he simply acknowledges that "General Order 22" exists. Doc. 95 at 17:2–6. Although some of Leach's allegations address the contents of General Order 22.6, there is no evidence before the Court as to the contents of General Order 22.6.[26] Thus, Leach cannot establish the unconstitutionality of General Order 22.6 or any liability resulting therefrom. Therefore, the Court will enter summary judgment in favor of Hoffman on this claim.

### K. Remaining State-Law Claims

Finally, Leach brings several state-law claims: a battery claim against Clark and Allport; a battery claim against Small; a battery claim against Poinsett and Collison; and a negligence claim against Knight. Doc. 50 ¶239–251. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Therefore, the

---

[26] The answer "admits the content" generally alleged, but denies Leach's allegations "as phrased" and avers that General Order 22.6 speaks for itself and must be read in its entirety. Doc. 51 at 17–18.

Court will decline to exercise its supplemental jurisdiction over these remaining claims. *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."). As such, the Court will dismiss the state-law claims, without prejudice.

## IV.   CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.  Defendants' Motion for Summary Judgment (Doc. 82) is **GRANTED**.

2.  The Clerk is directed to enter **JUDGMENT** on Count I in favor of Defendants Anthony Allport, Lori Beth Clark, Karla Small and against Plaintiff James R. Leach.

3.  The Clerk is directed to enter **JUDGMENT** on Count II in favor of Defendants Kyle Poinsett and Kyle Collison and against Plaintiff James R. Leach.

4.  The Clerk is directed to enter **JUDGMENT** on Count III in favor of Defendant Matt Tuggle and against Plaintiff James R. Leach.

5.  The Clerk is directed to enter **JUDGMENT** on Counts IV and V in favor of Defendants Anthony Allport, Lori Beth Clark, Karla Small, and Matt Tuggle and against Plaintiff James R. Leach.

6. The Clerk is directed to enter **JUDGMENT** on Counts VI, VII, VIII, and IX in favor of Defendant Kurt A. Hoffman and against Plaintiff James R. Leach.

7. The Court declines to exercise supplemental jurisdiction over Counts XII, XIII, XIV, and XV. Those claims are **DISMISSED**, **without prejudice**.

8. The Clerk is directed to terminate all deadlines and to **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida on March 28, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

47